ON REMAND FROM SUPREME COURT
AUGUSTINE, Judge.
The plaintiff, Associated Executive Control, Inc., filed this suit against Bankers Union Life Insurance Company to recover $50,000 due under a “finder’s fee” agreement. By the terms of that agreement, signed by both parties to this suit on January 30, 1974, Bankers promised to pay to A.E.C.
“a consulting, finding and servicing fee totalling $50,000.00 in the event that a sale is consummated for all of the stock of Security Guaranty Life Insurance Company which is owned by Bankers ... in the event that you (A.E.C.) are a moving force in the consummation of a transaction which is acceptable in the full and absolute discretion and approval of Bankers Union Life Insurance Company.”
A.E.C.’s principal contention is that although the sale of Security Guarantee Life Insurance Company stock was never consummated, having found a buyer for the entire stock of Security Guarantee Life Insurance Co., the fee is now due. A.E.C. claims that the sole reason for the transac *781 tion’s failure was Bankers’ last-minute insistence that the buyer repudiate A.E.C.’s efforts in negotiating the sale, a repudiation which the buyer could not and would not make in good faith.
Bankers denied these allegations, contending that the broker repudiation clause was not the sole cause of the transaction’s failure, and that there were other irreconcilable differences which prevented a meeting of minds between the buyer and Bankers.
The trial court rendered judgment in A.E.C.’s favor, based upon the specific finding that Banker’s insistence on the buyer’s repudiation of A.E.C. as the “moving force” of the transaction was the sole reason for the buyer’s refusal to go forward with the deal. Bankers appeals. We affirm.
The only issue raised by this appeal is whether the trial court erred in finding that the broker repudiation clause was the sole cause of the transaction’s failure.
The record reveals the following:
After signing the “finders fee” agreement of January 30, 1974, A.E.C.’s director, F.D.V. deLaBarre, contacted an associate named Darrel Jordan, a businessman whose own dealings were among entrepreneurs who might be interested in the purchase of a small insurance company such as Security Guaranty. Jordan knew a Mississippian named Roland Smith who was already interested in acquiring such a company, and when Jordan informed him of the availability of Security Guaranty’s stock, Smith expressed a definite interest in purchasing it.
DeLaBarre enlisted Jordan as his agent on behalf of A.E.C., and in the ensuing months, Jordan conducted extensive negotiations with Bankers on Smith’s behalf, advising each as to the other’s financial position and conveying the various arrangements to be made, all of this with a view to consummating the sale of stock. DeLa-Barre supervised Jordan’s activities and held frequent conferences with Smith as the negotiations developed.
On February 5, 1975, Bankers mailed to Jordan for Smith’s signature a written contract for the sale of Security Guaranty’s stock. Smith signed the agreement, and on April 14, 1975, Jordan travelled to Bankers’ home office in Denver, Colorado to deliver the signed document and to obtain Bankers’ signature. On behalf of Smith, Jordan was prepared to tender earnest money in the form of a cashier’s check payable to Bankers in the amount of $10,000.00.
Bankers, however, neither signed the contract nor accepted Smith’s earnest money. As it was explained to Jordan at that time, Bankers’ lawyers had determined that the contract required some minor revisions; the final agreement would be forwarded to New Orleans for closing. Jordan left Denver with the earnest money and Bankers’ promise to submit a revised contract in the next few weeks.
On April 25, 1975, Jordan received the revised contract, styled a “Stock Purchase Agreement,” containing the revisions which Bankers’ attorneys had drafted since the meeting in Denver. Among those changes was the following clause which caused buyer Smith to abort the transaction:
Buyer represents that he has not retained or used the services of any finder or broker or agreed to pay any finder’s or brokerage fee, commission or other compensation to any person on account of the transaction contemplated by this Agreement, except for the firm of Ola-gues, Jordan & Company, and Richard Troendle. Buyer agrees to pay any valid claim for such fee, commission or other compensation of such parties and of any other person employed or used by Buyer in connection with the transaction contemplated by this Agreement and to indemnify, defend and save Seller harmless from any such claim based upon any such arrangements that may exist between Smith and such parties. Buyer further represents that he has not had any dealings with, nor has he been influenced by, the firm of Associates Executive Control, Inc., 1501 American *782 Bank Building, New Orleans, Louisiana, or any of its agents, or F.D.V. deLaBarre in connection with the transaction contemplated by this Agreement. On the basis of such representation, Seller agrees to pay any valid claim of Associates Executive Control, Inc. or F.D.V. deLaBarre for a finder’s or brokerage fee, commission or other compensation on account of Seller’s dealings with such persons in connection with the transaction contemplated by this Agreement and to indemnify, defend and save Buyer harmless from any such claim. (Emphasis added).
The most compelling evidence for A.E. C.’s contention that the broker repudiation clause alone caused the sale to collapse is found in the testimony of the prospective buyer himself. Roland Smith stated unequivocally that but for Bankers’ insistence on the above provision, he would have gone forward with the purchase of Security Guaranty’s stock, and that although other changes which Bankers injected into the contract after Jordan’s trip to Denver were not wholly satisfactory to him, these alterations posed no real bar to consummating the sale. Smith explained, further, that he refused to sign the contract containing the questioned clause because he knew it to be false and because he feared legal reprisal by A.E.C.
The trial court placed great reliance on Smith’s testimony in reaching the determination that “the sole reason that the sale was not consummated was due to the conditions imposed by Bankers at the last minute requiring the prospective purchaser to represent contrary to the true facts that he had no deals with nor had been influenced by Associated.” Reasons for Judgment, p. 2.
Bankers offers several reasons for rejecting Smith’s testimony, however. Appellant emphasizes that there were several differences between the proposal of February 5 (to which Smith had agreed and which Jordan delivered in Denver) and that of April 24 (which contains the questioned clause). Bankers argues that these differences, and not the repudiation clause, were responsible for Smith’s refusal to consummate the sale of stock. Banker’s points primarily to a clause in the contract which allowed Bankers to retain its interest in unrelated litigation which had been previously filed by Bankers and its subsidiary, Security Guaranty, against F.D.V. deLa-Barre.
We cannot agree with Bankers. Aside from the testimony of Smith that the only reason that the deal was not consummated in April was the repudiation clause, there is additional testimony to that effect from Charles Roth. Roth was chairman of the Board of Bankers during the time the sale of Security Guarantee was being negotiated with Smith. Roth also testified that the only reason the sale of Security Guarantee was not consummated in April of 1975 was Rusty Smith’s refusal to repudiate A.E.C.’s efforts in negotiating the sale.
Given that principals on both sides of the transaction testified that the sale was not completed because of Smith’s refusal to repudiate A.E.C. we must conclude that the trial court was correct in its judgment.
We also approve the trial court’s finding that the defendant is entitled to offset in the amount of $12,338.89.
For the foregoing reasons the judgment of the trial court is hereby affirmed.
LOBRANO, J., dissents and will assign reasons.